Draft Two

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**MOHAN PAULIAH, PH.D.**
**PLAINTIFF**
**vs.**                                        **CASE NO: 3:23-cv-3113-CWR-**
**ASH**

**UNIVERSITY OF MISSISSIPPI MEDICALCENTER, ET. AL.**
**DEFENDANTS**

### DECLARATION OF MOHAN PAULIAH, PHD (28 U.S.C. § 1746)

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.      I am over the age of 18, of sound mind, and competent to testify to the matters stated herein. I am not a convicted felon, nor have I been adjudged non compos mentis. All facts alleged herein are based on my personal knowledge unless indicated otherwise

2.       I allege in my lawsuit that I was terminated from my employment as an Assistant Professor of Radiology and MRI Physicist at the University of Mississippi Medical Center (UMMC) because of my race, color, national origin, and age.

3.      I am of Indian descent (Tamil) and Indian nationality, and at the time of my termination, I was 52 years old.

4.      I allege that my supervisor, and the decision maker regarding my termination, Defendant Dr. Richard Duszak, the then Chairman of the Radiology Department,[1] was motivated by discriminatory animus, having made discriminatory remarks about my nationality, and having replaced me with Andrew M. Huettner, a younger white male with less experience than me.

5.      On December 13, 2021, I commenced working as a member of the faculty at the School of Medicine of the University of Mississippi Medical Center in Jackson, Mississippi, where I was an Assistant Professor of Radiology and MRI Physicist, in the Department of Radiology and, later, at the MIND (Memory Impairment and Neurodegenerative Dementia) Center.

---

[1] Dr. Duszak abruptly terminated his Chairmanship of the Department recently. https://radiologybusiness.com/topics/healthcare-management/leadership/richard-duszak-md-stepping-down-university-mississippi-radiology-chair

Draft Two

6.      My salary was $165,000 annually. As it was generally explained to me, $70,000 of my $165,000 annual salary covered my duties as an Assistant Professor of Radiology and $95,000 of my annual salary covered my duties as an MRI Physicist.

7.      As set forth in the hiring papers, the distribution of my responsibilities was as follows: 40% Clinical, 40% Research, and 20% Education.

8.      My job position at UMMC was "tenure track," which contemplated a six-year term or expectancy of employment.

9.      Under the terms of the Recruitment Agreement that I executed upon accepting my job, UMMC expressly committed to provide me three (3) years of continuous employment.

10.     I have a Ph.D. degree in Computer Science (specialized in Magnetic Resonance (MR) Physics and Medical Image processing).

11.     Before my faculty appointment at UMMC, I was a Research Associate - Medical Physicist at the Department of Radiation Oncology, Northwestern Memorial Hospital, Northwestern University, Chicago, Illinois.

12.     Before my appointment at Northwestern  University, I  was a Senior Research Scientist –Medical Physicist at Memorial Sloan-Kettering Cancer Center, New York, New York.

13.     I am a patented co-inventor of MRI technology ("Systems method and apparatus for multichannel imaging of fluorescent sources in real-time") ("Imaging systems and methods for Particle Driven Knowledge-Based and Predictive Cancer Radiogenomics").

14.     I have been an applicant and recipient of numerous research grants and related Imaging Technologies.

15.     I am  a permanent United States resident (Green Card).

16.     I reside in Madison County, MS, with my wife, Merlin Margaret Gnanasigamani Manogaram, M.D, a postdoctoral fellow physician scientist at UMMC, and our thirteen-year-old son.

17.     My wife and I were raised in Christian families.

18.     Our son attends Germantown Middle School, a public school in Madison County.

Draft Two

19.    Beginning in June 2021, I was recruited by UMMC to join the Radiology Department as an MRI Physicist.

20.    My proposed role would be taking key initiatives to establish Precision Hybrid Imaging and Informatics, leveraging Artificial Intelligence (AI); Magnetic Resonance (MR) Quality Assurance and Quality Control (QA/QC) and Safety programs; translational multimodal imaging research (MRI/PET/US/OI) and enhancing clinical workflow and protocol optimization.

21.    It was understood that I would be working in the research lab with Associate Radiology Professor Candace M. Howard-Claudio, M.D., Ph.D., Vice Chair & Director of Radiology Research and Director of the Biomedical Imaging Doctoral Program.

22.    At the time, I  thought the position at UMMC would be an excellent fit for my overall academic and innovative achievements and would be an ideal match for my credentials and experiences in health care settings.

23.    In September 2021, Dr. Howard- Claudio invited me to interview in person at UMMC.

24.    I met with the faculty and residents and toured the facilities, and prepared a 45-minute MR physics lecture that I delivered to faculty and radiology residents.

25.    As noted, my position at UMMC was tenure track and, with that designation, I was assured job security and academic freedom.

26.    Tenure track creates an expectancy of permanent employment once tenure is obtained by the sixth year of employment.

27.    I  was recruited by UMMC to help develop national recognition for the Radiology Department.

28.    I was hired in November 2021, through a letter of intent issued by Edward Green, M.D., Chairman of the Radiology Department on October 21, 2023.

29.    Upon my initial arrival in Mississippi in 2021, Dr. Green and Dr. Howard welcomed me with open arms.

30.    I  enthusiastically embraced their employment offer, inspired by their statement: "We are excited about the potential of your leadership and have complete confidence that you will make a substantial contribution to the growth of a nationally renowned department at UMMC School of Medicine."

Draft Two

31.    The surroundings at work and in the Jackson and Madison area were reminiscent of my hometown, and the local church, the public schools and the UMMC School of Medicine resonated with me.

32.    During my time at UMMC, Dr. Green and I formed a strong bond, sharing daily inspirational biblical verses but also injecting moments of laughter into our interactions.

33.    I considered Dr. Green an extraordinary individual, and he offered his prayers when he learned of the my termination of employment on October 28, 2022.

34.    My wife and I  each had career employment opportunities at Virginia Commonwealth University (VCU), but moved to Jackson from Richmond, VA in reliance on assurances from Dr. Green that I would serve in a prominent faculty and research position at UMMC for a period of several years.

35.    Defendant Dr. Richard Duszak became Chairman of the Radiology Department on July 1, 2022.

36.    Shortly after his arrival in July 2022, Dr. Duszak made the following comments to me: "How about sending you back to India," and "I will google a job for you."

37.    On October 28, 2022, Dr. Duszak issued a letter to me stating that my position as a Radiology Professor would end, seven months later, effective June 30, 2023 and, moreover, that my "role as a Physicist and the component of salary associated with it is being removed…. [e]ffective immediately…" and that my salary was being reduced to $70,000 from $165,000.

38.    On that same day, I met Dr. Duszak, along with Molly Brasfield, UMMC Chief of Human Resources, and Dr. Howard-Claaudio, to discuss the immediate termination of my Physicist position and termination of my professorship effective June 30, 2023.

39.    During this meeting, it was made clear to me by Ms. Brasfield that Dr. Duszak's termination decision was not because of any work performance issues on my part , but instead were due to a new "business model" for the Department adopted by Dr. Duszak.

40.    On subsequent occasions, Ms. Brasfield told me that Dr. Duszak's decision regarding my termination was because of the new business model.

Draft Two

41.     Two weeks later, on December 14, 2022, Dr. Duszak issued a memorandum, wherein he reinstated me to the Physicist position, reinstated my $165,000 salary, and assigned me to a research role at the UMMC MIND Center. https://www.umc.edu/mindcenter/MIND-CENTER-Home-page.html

42.     Dr. Duszak's December 14, 2022 memorandum encouraged me to seek other faculty and staff positions at UMMC as an internal applicant.

43.     I believe that Dr. Duszak was compelled to reinstate me after receiving objections by persons in the Radiology Department and UMMC administration regarding his abrupt decision to terminate me.

44.     As discussed herein, I was never told that my contract was not being renewed (in other words that I was being terminated) "as a result of job performance concerns with [the Plaintiff]," as UMMC alleged in its EEOC position statement.

45.     Notably, other leaders and directors at UMMC acknowledged my excellent performance skills and innovation and came forward to support me, and one faculty member stated that "All of us appreciate your skills and expertise; I hope we can continue working together!"

46.     UMMC's position statement letter to the EEOC is the first time I had ever heard that (a) I had "interpersonal difficulty with co-workers" (I deny that was ever the case);(b) I failed to follow instructions from my immediate supervisor" ( although I am not sure who this immediate supervisor is, I assume this means Dr. Duszak, but do not know what instructions I failed to follow); (c) the I had "maladaptive communication behaviors" ( I deny this and state that I communicate well and with politeness to coworkers and others, both in person and through emails and memoranda), and (d) that I was not able to "lead major initiatives" ( I believe that for every "major initiative" I was selected to perform at UMMC, I met all expectations.)

47.     I met frequently with Dr. Duszak and corresponded with him through emails about various matters, including evidence-based documents, ACR MR manuals, and ACR-AAPM reports related to Medical Physicists' requirements, key initiatives such as MR QC and Patient safety and plans on improving MR Physics services, and innovative ideas for our department to lead nationally.

48.     I believe I also provided Dr. Duszak, who was new to the Radiology Department and UMMC, with valuable "feedback" as well.

Draft Two

49.    Dr. Duszak and UMMC falsely allege in this litigation that I displayed a lack of skills reasonably expected by UMMC of a faculty member with a substantial service responsibility of 40% effort.

50.    I categorically deny  this broad allegation. I do not know what "skills" UMMC is referring to.

51.    I went through a rigorous competitive interview process before I  was hired, and the Radiology Department faculty was impressed with my credentials.

52.    Prior to my faculty appointment at UMMC, I was a Research Associate - Medical Physicist at the Department of Radiation Oncology, Northwestern Memorial Hospital, Northwestern University, Chicago, Illinois.

53.    Prior to my appointment at Northwestern University, I was a Senior Research Scientist –Medical Physicist at Memorial Sloan-Kettering Cancer Center, New York, New York.

54.    I am  a patented co-inventor of MRI and related imaging technology ("Systems method and apparatus for multichannel imaging of fluorescent sources in real-time") ("Imaging systems and methods for Particle Driven Knowledge-Based and Predictive Cancer Radiogenomics").

55.    I have  been an applicant and recipient for numerous research support and grants relating to MR physics.
.
56.    After joining  UMMC, I  successfully executed novel Clinical MR pulse sequences and signed Material Transfer agreements (MTA's), Consumer to Product (C2Ps), and Work-In-Progress (WIPs) with elite institutions---- MGH/Harvard University, John Hopkins, Mayo Clinic, and OSU, and Original Equipment Manufacturers (OEM)-Siemens on Clinical MR pulse sequences.

57.    I have advised and educated Siemens Engineers/ product Managers on Clinical MR sequence and optimization, introduced novel MR pulse sequences, implemented newer clinical MR imaging protocols without any additional cost, and negotiated licensing.

58.    I have implemented and resolved all issues during and after the upgrade of Clinical scanners and closely worked with vendors to evaluate, acquire, and install new and novel MR sequences.

59.    At UMMC, I was also nominated and served as a member of the Intellectual Property (IPC) Committee, Medical Center Radiation Safety (RS) Committee, Advanced Neuroimaging Core (Structural and functional MR Imaging), Radiological

Draft Two

Imaging and Data Governance Committee, IRB Review Committee (Radiology), and Research Advisory Committee.

60.    In the month of August 2022, Dr. Duszak promoted me to be the Co-Chair of MR Quality Control and Patient Safety Committee for UMMC.

61.    I have working experiences from top-notch U.S. institutions, including Memorial Sloan Kettering Cancer Center and internationally reputed universities (L'université de Bourgogne, France and Sanjay Gandhi Post Graduate Institute of Medical Sciences).

62.    I have engaged in extremely productive work, including intellectual property rights and commercial licensing, and first in Human Trials FDA-approved translational clinical products (Drug/Device).

63.    I have worked as a team member to secure multiple million-dollar grants from federal as well as private agencies and served as one of the Co-Principal Investigator(s) and key personnel in establishing (CCNE's) -MSKCC-Cornell Center for Translation of Cancer Nanomedicines.

64.    I have been an applicant and recipient of numerous research support and grants relating to MR Medical physics.

65.    I secured my U.S. Green Card ( Permanent Resident, Immigration Form I-551) under the "extraordinary abilities" category, without any employer sponsorship.

66.    Dr. Duszak and UMMC have falsely alleged that I failed to ensure appropriate audits for two major initiatives for The Joint Commission and American College of Radiology Accreditation.

67.    I categorically deny this allegation.

68.    Normally, the ACR MRI accreditation renewal for UMMC's MR Facility main campus is required every three years.

69.    The next renewal deadline was scheduled for October 17, 2023.

70.    I joined UMMC on December 13, 2021.

71.    For the year 2022-23, I successfully completed the ACR Annual survey for all nine MRI systems between July 2022 and August 2022.

Draft Two

72.     The survey report was timely submitted to Dr. Duszak, the Chair, on August 30, 2022.

73.     As a result, the next renewal expiration date was extended to October 17, 2026.

74.     You can find a copy of the report on the website at the following link: https://www.acraccreditation.org/accredited-facility-search.

75.     I had numerous discussions and meetings with Dr. Duszak, emphasizing the importance of adhering to ACR regulations and manual requirements.

76.     I introduced the ACR manual for the first time to the Radiology Department and initiated quarterly meetings on MR QC and Safety.

77.     In September 2022, I was appointed as the Co-Chair of the committee on MR Quality Control and Patient Safety, which was previously non-existent at UMMC.

78.     Additionally, I regularly sent emails to Dr. Duszak, attaching copies of the ACR MR Manual, the Role of MRI Physicists, and the report/recommendations from the American Association of Medical Physicists regarding staff requirements.

79.     Upon my arrival as an MR Physicist, I dedicated myself to the implementation of vital on-site initiatives focusing on MR safety and quality assurance.

80.     Engaging in discussions with the MRI Manager, Director of Imaging, and MR Medical Director, I actively addressed technical concerns related to MR QA/QC and MR safety. This led to the initiation of pivotal projects aimed at elevating MR safety protocols and addressing potential factors that are vital to patient well-being and safety.

81.     Drawing upon my practical expertise as a proficient service engineer, adept software developer, and innovative mind in the fields of Medical Imaging, Physics, and Engineering, I adeptly pinpointed and resolved significant challenges within the Radiology Department.

82.     This approach not only established a robust framework for ensuring patient safety but also yielded long-term cost savings for UMMC.

83.     The Department of Radiology at UMMC was previously lacking such initiatives.

Draft Two

84.    Subsequently, I was honored to assume the role of Co-chair of MR Safety and QC, marking a significant milestone.

85.    I spearheaded the initiation of quarterly meetings, marking the first of their kind in the department's history.

86.    Dr. Duszak and UMMC falsely allege that there was an over six-month delay from my date of hire for me to request necessary hardware, software, VPN access, or initiate conversations and plans with the radiology manager and techs.

87.    I deny this allegation.

88.    In the month of February 2022, when I requested a laptop for carrying out clinical MR Physics and related work, I had initially been provided with an outdated and non-functional Apple Mac Book #158383. This laptop was over 10 years old, rendering it unsuitable for the tasks at hand.

89.    Despite my requesting a replacement, Jennifer Smith, the Business Development Manager for the Radiology Department, informed me that the Radiology Department lacked the necessary funds to purchase a new laptop.

90.    Additionally, I attempted to acquire a spare, replacement, or loan through the UMMC Information Services Department, but my request was unsuccessful.

91.    Consequently, on July 29, 2022, or so, I handed over the Apple Mac Book to UMMC personnel for proper disposal.

92.    During a meeting on July 29, 2022, Dr. Duszak denied my request for managerial approval to install several software applications that were available free of cost and had been previously approved by the UMMC Information Services Department.

93.    Dr. Duszak and UMMC falsely allege that when I did initiate requests for software, it resulted in multiple complaints from administrative staff due to my so called mannerisms during these requests.

94.    I deny this this allegation and find it baffling. I do not know which "administrative staff" complained and what they complained about. I do not know which "mannerisms" the staff might have complained about. The Plaintiff has never been told during his employment at UMMC that he has objectionable mannerisms.

95.    Dr. Duszak and UMMC falsely allege that my interactions with staff were dismissive and condescending rather than collaborative and collegial, as would be expected of a physicist leading a quality improvement effort.

Draft Two

96.    I deny this allegation and, like the comment about my" mannerisms," finds it equally baffling. I have never been told during my employment that I  was ever "dismissive and condescending" to anyone. If anything of this nature had ever been brought to my  attention, he would have apologized to the offended person.

97.    Dr. Duszak and UMMC falsely allege that Dr. Duszak advised me that all subsequent software requests should be vetted through him  to ensure that the request was communicated in a professional manner.

98.    I deny this allegation. I kept Dr. Duszak informed about all significant software issues. When I requested a few listed free software items on the UMMC website for carrying out MR Physics-related work, as a manager, Dr. Duszak denied granting approval to the free software, which was available UMMC service desk website. https://myservicedesk.umc.edu/ServiceDesk.WebAccess/ss/search/search.rails?searc

99.    Dr. Duszak and UMMC falsely allege that I ignored those instructions and continued to make specific software requests of staff. I deny this allegation

100.    Dr. Duszak and UMMC falsely allege that my   contumacious conduct and maladaptive behaviors created a toxic culture that contributed to at least one leader contemplating stepping down from their role. I deny this allegation. I do not know who the "leader" might have been and what "role" that person contemplated stepping down from. I deny that any of my conduct and behavior was "contumacious" and "maladaptive."

101.    Dr. Green, the Chairman of the Department who hired me, knew that I was diligently working to obtain board certification.

102.    I openly addressed my board certification eligibility and experience during the interview process, leading to my selection as Assistant Professor of Radiology

103.    I submitted the necessary documentation regarding board certification to Dr. Duszak's satisfaction.

104.    Based on this information, Dr. Duszak directed me to undertake the Joint Commission (August 2022) and ACR annual survey (October 2022).

105.     I was eligible for board certification in 2023 from the American Board of Medical Physics – MR Physics track - 2023 (appearing) and the American Board of Magnetic Resonance Safety MRSE - 2023 (appearing).

Draft Two

106.    Upon my  termination, I was in the process of getting  board certification and appeared for the ABMP exams and ABMRS exam.

107.    Furthermore, it is worth noting that previous MRI Physicists, namely Dr. Judd Storres and Dr. Judy R. James, had not obtained certification through ABMP or ABR, but were provided ample opportunities when they joined UMMC

108.    Moreover, I received approval from Dr. Duszak for travel and exam fee reimbursement for both the American Board of Magnetic Resonance Safety Expert (ABMRSE) exams in May 2023 and the American Board of Medical Physics exams in June 2023.

109.  UMMC and Dr. Duszak falsely allege that I did not provide  with any specific timetable as to whether he would be granted certification.

110.    I deny this allegation and state that Dr. Duszak was aware of the steps I was taking to obtain certification.

111.  UMMC and Dr. Duszak falsely allege that I misrepresented that I had considerable experience with American College of Radiology Accreditation and the required audits.

112.    I deny this allegation. I have never misrepresented my qualifications and experience.

113.    Pursuant to the American College of Radiology (ACR) minimum standards, Plaintiff fully meets the qualifications for MR accreditation responsibilities— including possessing a doctoral degree in MRI physics and extensive experience in clinical MR operations. My leadership history at internationally recognized institutions speaks directly to his managerial and technical competence.

114.  UMMC and Dr. Duszak falsely allege that I was deficient in MR physics oversight. However, I successfully resolved MR magnet upgrade issues and MR Clinical Certification for the patient scan; Implemented vendor-validated pulse sequences;
Co-chaired the departmental QC and safety committee; and acted in accordance with diagnostic suitability for ACR compliance and review. These facts directly rebut claims of professional inadequacy and reinforce the argument that nonrenewal lacked a legitimate foundation.

115.    Defendants—and particularly Dr. Duszak—sought to portray me as chronically behind on ACR accreditation by alleging Deep South Medical Physics

Draft Two

LLC filed its final MR audit report on August 2, 2021. The documentary record
proves otherwise and exposes deliberate misstatement:

> **Year 2021:** The MR Annual Survey Reports for all nine UMMC magnets
> were not submitted by Deep South on August 2, 2021.
> [Pauliah_UMMC_001782(Fed)].  Deep South's actual submission date
> was **October 31, 2021-**almost three months later [Pauliah_UMMC_001859
> (Fed)] and **before** I assumed primary responsibility for accreditation duties.
> [Pauliah_UMMC_001781(Fed)];
> [Pauliah_UMMC_001781(Fed)];[Pauliah_UMMC_000817(Fed)].
> **Year 2022:** Further, I submitted all of my own MR Annual Reports
> by **August 30, 2022**, covering scanner compliance for **June–July 2022**. This
> timeline met UMMC's internal Joint Commission audit requirements. In fact,
> Dr. Richard Duszak acknowledged in a July 29, 2022 email: "We clearly meet
> 'pass' criteria for all TJC requirements." — *Admitted via RFA No. 5*
>
> **Year 2023**: I repeatedly forwarded that October 31 submission, along with
> the upcoming ACR renewal deadline of **October 17, 2023**, to demonstrate
> that the prior physicist enjoyed a comparable or longer submission window
> [Pauliah_UMMC_001781-82 (Fed)]; [Pauliah_UMMC_001784-
> 87(Fed)]; [Pauliah_UMMC_000817(Fed)]; [Pauliah_UMMC_000817 (Fed)].
>
> Dr. Morris conceded under oath that he "did not know the specific dates"
> of either the initial Deep South submission or the next ACR deadline, leaving
> Defendants' August 2 narrative unsupported by any firsthand knowledge【
> Morris Dep. 23:1–5】.
>
> Dr. Howard confirmed that no accreditation failure was ever cited
> against me—contradicting Defendants' fabricated delay theory and
> confirming that my performance record was unblemished as of June 2023【
> Howard Dep. 27:1–3】.

**Contrary to Defendants' narrative, I completed and submitted all nine
MR Annual Survey Reports for 2022 well before the internal audit deadline
of August 30, 2022.** These submissions documented scanner performance and
procedural compliance for the June–July 2022 MR Annual Survey testing window,
placing them squarely within the required accreditation cycle.

> Moreover, Defendants' own leadership acknowledged the sufficiency of
> these reports. In a July 29, 2022, internal email, Chair Dr. Richard Duszak

affirmed: "We clearly meet 'pass' criteria for all TJC requirements."
— *Admitted via RFA No. 5*


116.    Defendants falsely assert that I waited over six months after my hire to request the hardware, software, and VPN access necessary to complete critical audit tasks

117.    Shortly after joining UMMC in **January 2022**, I formally requested a functional laptop to perform MRI physics duties. Instead, I was issued **Apple MacBook #158383**, a device over **10 years old, unable to login** and incapable of supporting medical imaging software. Despite repeated follow-ups, **Jennifer Smith**, Business Development Manager, admitted the department lacked funds for a replacement.

118.    I sought a spare from UMMC Information Services but was denied.

119.    Ultimately, on **July 29, 2022**, the unusable laptop was surrendered for disposal.

120.    Efforts to retrieve the former physicist's device, software CDs, and shared folders were likewise unsuccessful. No support was provided by Imaging Director **Ashley Darby** or MRI Manager **Christopher Turner**, further delaying the departmental resources tasks.

121.    When I sought approval to install **free UMMC-approved applications** via the institutional service desk, Chair **Dr. Richard Duszak** denied the request—despite the same tools being approved for previous medical physicists and other users.

122.    Prior to Chair Duszak's arrival, **Dr. Robert Morris,** vice chair of clinical operations in the Radiology14 Department,had initiated a purchase order for a suitable laptop. Upon assuming office, **Dr. Duszak halted that order**, stating the device was "too expensive" and Plaintiff didn't need a "Maserati or something fit for a celebrity." He placed a downgraded order, **further delaying** critical equipment delivery and impeding audit duties.

Draft Two

123.   Plaintiff also requested free institutional tools listed on UMMC's own service desk, yet Duszak denied access—despite prior departmental approval. Emails confirm Plaintiff kept leadership apprised of all software issues. In his deposition, Plaintiff describes this blockage as part of a broader effort to prevent him from performing his designated functions.

124.   Recognizing the institutional failure, **Dr. Candace Howard** offered her personal laptop to Plaintiff for completing the **ACR MRI Annual Survey**. She confirmed in her deposition:
"He did not receive adequate departmental support and I loaned my laptop so he could complete the report." — *Howard Dep. 33:5–34:3*

125.   Despite these hurdles, Plaintiff submitted all MR Annual Reports by **August 30, 2022**, covering scanner performance and procedural compliance for **June–July 2022**—undermining Defendants' assertion of "missed milestones." In an internal email, **Dr. Duszak admitted**:"We clearly meet 'pass' criteria for all TJC requirements." — *Admitted via RFA No. 5*

126.   Defendants' narrative collapses under deposition scrutiny:
·   **Dr. Morris**: "I did not know the specific dates." — *Morris Dep. 23:1–5*
·   **Dr. Howard**: "No accreditation failure was ever cited against Dr. Pauliah."
— *Howard Dep. 27:1–3*

127.   Despite earlier citing my performance, Dr. Duszak under oath confirmed that his departmental "business model" eliminated all three Ph.D. scientist positions and reorganized research priorities under a new strategic alignment, thereby confirming that the Plaintiff's position was structurally displaced. *"I eliminated all three of our Ph.D. research scientist positions."* Duszak Tr. at 31:7–32:16.

Draft Two

- Yet, in direct contradiction to this claimed elimination, Dr. David Gordy, who is white, remains employed as an Assistant Professor of Radiology, continuing in his faculty role during and after the alleged restructuring.

- https://umc.edu/Faculty/Gordy_David_P

- This selective retention of Gordy raises serious concerns about inconsistent application of the restructuring rationale and supports Plaintiff's claim of discriminatory treatment

- This admission reframes the non-renewal/termination as part of a department-wide realignment, not a targeted response to Plaintiff's conduct. However, the record establishes that Dr. David Gordy, a white Assistant Professor with a Ph.D., remained employed in the department post-reorganization. (Duszak Tr. at 31:7–32:16). This selective retention belies the uniformity of the alleged position elimination and instead supports an inference that the "business model change" was selectively applied. It further evidence of Disparate treatment and inconsistent rationale.


128.    In September 2022, I was abruptly directed by Dr. Duszak to initiate the ACR MR Annual Survey, despite it being well outside the formal accreditation window, which dates to October 17, 2023. I was instructed to complete accreditation documentation for each MRI scanner within an accelerated two-day timeframe—a demand that deviated markedly from standard protocol. Faced with this constrained timeline, I proactively requested procedural guidance to ensure compliance and uphold institutional standards. [Pauliah_UMMC_000815-19(Fed)]

Draft Two

129.    This incident reflects both a lack of institutional support and a disproportionate burden placed on me relative to similarly situated colleagues. The premature timing and accelerated deadline, without accompanying procedural assistance, reinforces a pattern of selective scrutiny and unjustified urgency that was neither policy-driven nor uniformly applied. It further substantiates my claim that institutional expectations were manipulated to create manufactured performance narratives inconsistent with historical practice and fairness.

130.    Defendants' reliance on Plaintiff's alleged lack of ACR audit experience is belied by their treatment of similarly situated UMMC physicists. Dr. Judd Stores, Dr. James, and Dr. Andrew Huettner were all granted substantive responsibilities despite having no prior ACR audit experience before assuming their roles.

131.    Dr. Judd Stores, for example, was permitted to submit MR Annual Reports without prior accreditation oversight—showing institutional precedent for assigning duties regardless of audit history.

132.    Dr. Huettner, although recruited into the MRI physicist role post-removal, was not entrusted with the accreditation task for 2023. This reinforces that audit experience was not a uniform requirement, nor did it serve as a legitimate barrier to participation.

133.    These comparators establish a clear pattern of selective enforcement, where I  was held to a standard not applied to others similarly situated. Moreover, I fulfilled my duties as designated physicist in accordance with ACR policy, which requires document signing—not personal performance of every audit task. Delegation is institutionally accepted, and the record confirms my compliance.

134.    More critically, my fulfillment of accreditation duties aligns with ACR's protocols, which require document signatures only from designated physicists. This directly rebuts any suggestion that I was unfit for the role due to delegation concerns.

Draft Two

135.    The post-removal appointment of Dr. Huettner further evidences the inconsistency: although hired into the MRI physicist position, he was not assigned ACR accreditation duties. Instead, the institution retained Deep South Physics to conduct the MR Annual Survey for 2023, signaling either a lack of confidence or intent to deprioritize in-house expertise. This deviation from institutional practice bolsters my claim of selective scrutiny and raises substantial doubt as to Defendants' asserted rationale.

136.    **Discriminatory Remarks by Dr. Duszak and False representation to EEOC by UMMC warrants liability under 18 U.S.C. § 1001**

- I was terminated from MRI Clinical Duties on October 28, 2022, and the non-renewal followed a pattern of hostility and humiliation based on national origin, compounded by material misrepresentations to a federal agency. In sworn deposition testimony, I confirmed that Chair **Dr. Richard Duszak** made the following statements during one-on-one interactions:

- "How about sending you back to India," and "I'll Google a job for you."
  — *Pauliah Dep. 152:11–155:12*

- These remarks reflect not only personal animus but a broader effort to construct a discriminatory narrative. I formally reported these statements during an HR dismissal meeting with Director **Chris Morgan** on **May 30, 2023**, as captured in the transcript:

- "He retaliated on that move. And he discriminated me many times … I can Google job for you.
  How about send you back to your country."
  — *Transcript, Pauliah Radiology HR Meeting, 00:23:10*

- Morgan repeated the remark verbatim during the same meeting:

- "Just to send you back to your country."
  — *Transcript, Pauliah Radiology HR Meeting, 00:23:37*

- Despite this recording and my prior complaint to **Chief HR Officer Molly Brasfield**, UMMC's formal EEOC position statement response—**signed under perjury of law by HR Director Chris Morgan**—falsely claimed that **no discrimination complaint was**

**ever filed**. This contradicts both the transcript and internal communications, and it forms the basis for liability under **18 U.S.C. § 1001**, which prohibits knowingly and willfully making false statements to a federal agency.

- The record contains admissible testimony, corroborated by contemporaneous recordings and HR acknowledgment, sufficient to create a triable issue on **retaliation**, **discriminatory intent**, **hostile work environment,** and **institutional cover-up** and supports 18 U.S.C. § 1001 claims (Appendix AA - Exhibit AA)

- I was recruited as a tenure-track faculty member and removed from the MR physicist position and terminated Clinical activities, and later issued non-renewal without cause, despite prior salary support arranged by Chief HR Officer Molly Brasfield. I was informed that termination (non-renewal) was based solely on "business model" justification.

- I was not treated equally, contrary to UMMC's EEOC guidance regarding recruitment, training, and affirmative action. I had previously notified HR leadership of this discriminatory treatment.


137. **Institutional Abdication Of ACR Quality-Control And Safety Duties**

- I proactively discussed the implementation of the ACR QC manual, recognizing this void and failure of ACR compliance with the Radiology leadership, Dr. Duszak, Dr. Morris, and Dr. Howard, and helped organize the first departmental MR Safety & Quality Committee. Only after Dr. Duszak had formally appointed me as co-chair—a de facto admission of institutional neglect. [Pauliah_UMMC_001781 (Fed)]

- The record demonstrates that the University of Mississippi Medical Center (UMMC) Radiology leadership systematically abdicated its duties under nationally recognized standards for MRI quality control and safety.

- The 2015 American College of Radiology (ACR) MRI Quality Control Manual (pp.8, 23) mandates that Supervising Radiologists must:

  - Select a primary QC technologist and ensure the availability of test equipment and materials.

Draft Two

- Allocate staffing and scheduling to allow for QC test execution, recording, and result interpretation.
- Review the technologist's QC test results quarterly and the qualified medical physicist's results annually.
- Oversee the MRI safety program for all individuals in and around the imaging environment.

- The 2024 ACR Manual on MR Safety (pp. 13–16, 25) further requires facilities to:
  - Appoint an MR Medical Director (MRMD) to oversee MRI safety practices.
  - Designate a Magnetic Resonance Safety Officer (MRSO), Magnetic Resonance Research Director (MRRD), and an advisory MR Safety Expert (MRSE).
  - Implement written policies and procedures for the safe conduct of MRI examinations.
  - During both my pre-tenure and tenure periods, UMMC failed to designate any personnel for the required MRSO, MRRD, or MRSE roles. No structured safety program existed, and no formal oversight mechanisms were instituted.

- Recognizing these omissions, I initiated conversations regarding implementation of the ACR QC Manual and independently helped organize the first departmental MR Safety & Quality Committee. [Pauliah_UMMC_001781 (Fed)]
- In deposition, Dr. Morris—who co-chaired the committee with me—admitted under oath that he had "never reviewed" the weekly QC logs, did not know my faculty title, and had not implemented any formal MRI safety protocols. (Morris Dep. 23:1–40:3) These statements demonstrate wholesale disregard of the ACR QC Manual's review obligations.
- Dr. Duszak, in his deposition, disclaimed any firsthand familiarity with MRI quality or safety data. He attributed my termination to a vague "business-model shift," not to performance or procedural deficiencies. (Duszak Dep. 11:1–14:25) His justification directly contradicts the documented absence of any designated safety personnel or QC policy failures. and underscores the wholly pretextual nature of Plaintiff's removal. (Appendix AA- exhibit AB)

Draft Two

- Taken together, UMMC's Radiology leadership failed to satisfy explicitly written ACR standards—allowing no designated safety officers - MRRD, MRSO, MRSE, ignoring regular QC reviews, and repudiating core safety policies. These lapses—reflected in official manuals, deposition testimony, and internal practices.

## 138. ACR QUALITY-CONTROL & SAFETY FAILURES

- **Systemic Quality-Control Documentation Failures**
  Under both the 2015 ACR MRI Quality Control Manual and the 2024 ACR Manual on MR Safety, UMMC was obligated to maintain comprehensive and accessible documentation of all MR QA/QC activities—including coil inventories, equipment status logs, and scheduled safety reviews—for each scanner. ACR guidelines explicitly require these records be retrievable in real time by technologists, medical physicists, service engineers, Accreditation members, and leadership (ACR QC Manual pp. 8, 23; Safety Manual pp. 13–16, 25).

- Internal correspondence confirms deliberate institutional noncompliance:

  - **Misplaced QC Logs & Incomplete Weekly Reports:** On July 29, 2022, Dr. Duszak admitted that QC binders were kept "in a slot on Cody's door," not adjacent to the scanner as required, and conceded that "not all weeks are documented" in the QC logs [Pauliah_UMMC_000804 (Fed)].

  - **Refusal to Allocate Dedicated QA Staff:** On July 22, 2022, Imaging Director Ashley Darby rejected my request for dedicated technologists to assist in establishing standardized QA/QC programs, claiming such work was "**out of our clinical scope**" despite ACR mandates requiring precisely that staffing support [Pauliah_UMMC_001323 (Fed)].

  - **Failed Centralization of QA/QC Documents:** On July 28, 2022, I formally requested centralized recordkeeping and committee oversight for QA activities. Neither a common folder nor routine QA committee meetings were ever implemented [Pauliah_UMMC_000805 (Fed)].

Draft Two

- **Lack of Coil QA Inventories, Service Engineer reports, and Functional-Status Reports**
  - UMMC failed to maintain coil QA inventories, service engineer reports, and functional-status records, violating ACR standards (ACR manual page 23). Despite my inquiries, Ashley Darby confirmed that technologists and leadership "do not have access or ability to pull this information," leaving critical compliance data inaccessible.
  - Siemens' Teamplay platform, relied on by UMMC, does not store coil QA, third-party testing results, or preventive maintenance logs—rendering the institution practically incapable of fulfilling ACR documentation mandates.
  - On July 28, 2022, I submitted Medical Physicist's recommendations outlining urgent compliance needs, including weekly QA reports, comprehensive logbooks, and retirement of obsolete forms. I directed MRI Manager Cody Turner to adopt the updated "Large Phantom Weekly MR Equipment QC Form" dated 12/08/2020, but this was never enforced before.[Pauliah_UMMC_000807 (Fed)].
- The collective failure to centralize records, convene oversight committees, assign QA personnel, and conduct mandated supervisory reviews amounts to systemic noncompliance. In deposition, MR Medical Director Dr. Morris admitted under oath that he "never reviewed" the weekly QC logs and failed to execute quarterly and annual supervisory reviews required by the ACR QC Manual [Morris Dep. 36:10–40:3].
- These safety failures conflict directly with Defendants' claims of rigorous oversight and quality assurance. They provide compelling evidence of procedural negligence, institutional disregard for MRI safety governance, and retaliatory obstruction following my attempts to rectify the deficiencies.

139. **Collusion in Plaintiff's Termination and Retaliatory Pretext**

- Defendants have portrayed my termination as part of a neutral "business model shift." However, deposition testimony and internal communications contradict this characterization and demonstrate coordinated decision-making and factual

Draft Two

misrepresentation by Chair Dr. Richard Duszak and MR Medical Director Dr. Robert Morris.

- In his sworn deposition, Dr. Morris admitted direct participation in my termination, stating:
  - "It was ultimately Dr. Duszak's decision."
  - "I'm sure I did [have input]." (Morris Dep. 63:13–15)
  - "Dr. Paul was not able to provide the accreditation support that we needed." (Morris Dep. 63:16–19)
- These admissions confirm that the decision was not limited to HR or administrative actors but involved active engagement by clinical leadership overseeing MRI safety and accreditation operations.
- Throughout my tenure, I undertook multiple initiatives to improve compliance and safety—including implementing the updated ACR QC phantom form dated December 8, 2020, establishing a centralized QC folder, and requesting dedicated technologist support. These efforts were routinely ignored or obstructed.
- In August 2022, I was formally appointed co-chair of the MR Safety & Quality Committee by Dr. Duszak, yet was later accused by the same leadership of failing to support accreditation—despite UMMC's failure to designate any MRMD, MRSO, or MRSE personnel at that time.
- The Defendants' response to the Equal Employment Opportunity Commission (EEOC) denied knowledge of discrimination complaints, despite a recorded May 30, 2023, meeting with HR during which those complaints were explicitly raised.
- Dr. Morris acknowledged under oath that he never reviewed my weekly QC logs, did not know my official title, and had failed to carry out quarterly QC reviews mandated by the ACR MRI Quality Control Manual (Morris Dep. 36:10–40:3). Yet he attributed my termination to "accreditation delays" and "interpersonal difficulties"—claims that are unsupported by peer feedback, technologist reports, or QC documentation.
- Dr. Morris confirmed that Andrew Huettner assumed key duties I previously managed— such as Joint Commission audits, protocol support, and QC documentation—while paradoxically claiming Huettner was not a "replacement" (Morris Dep. 60:10–20). This

position is contradicted by Dr. Howard's deposition, which affirmed my superior qualifications and intentional selection over Mr. Huettner (Howard Dep. 17:10–18:4).

- These cumulative facts—joint decision-making, coordinated obstruction of my ACR-compliant recommendations, contradictory EEOC statements, and pretextual justification—constitute clear evidence of collusion and retaliation. They render Defendants' motion for summary judgment factually and legally unsustainable, and raise triable questions of discriminatory motive and procedural unfairness.

140. **Fabrication of Accreditation Timeline Linked to Plaintiff's Performance**

The evidentiary record contradicts Defendants' claim that accreditation delays warranted my removal. Defendants allege that Deep South Medical Physics LLC submitted final MR audit reports on **August 2, 2021**. This is demonstrably false. In fact, Deep South Physics, PLLC submitted the MR Annual Survey Reports on October 31, 2021—nearly three months later, and prior to my assumption of primary accreditation responsibilities. [Pauliah_UMMC_001782(Fed)]; [Pauliah_UMMC_001781(Fed)]; [Pauliah_UMMC_001859(Fed)]; [Pauliah_UMMC_000817(Fed)]

- In contrast to Defendants' retroactive allegations of delay:
  - I completed and submitted my own MR Annual Reports by August 30, 2022.
  - These reports covered scanner compliance testing for June–July 2022, in full alignment with UMMC's internal Joint Commission audit requirements.
  - Chair Dr. Richard Duszak personally acknowledged in a July 29, 2022, internal email: "We clearly meet 'pass' criteria for all TJC requirements." — Admitted via RFA No. 5
  - I repeatedly forwarded the October 31, 2021, submission date to clarify that the previous physicist operated within a comparable or more extended timeline than mine. [Pauliah_UMMC_001781–82(Fed)]; [Pauliah_UMMC_001784–87(Fed)]; [Pauliah_UMMC_000817(Fed)]

- Dr. Morris testified under oath that he "did not know the specific dates" of either Deep South's submission or the upcoming ACR deadline. — Morris Dep. 23:1–5 This

Draft Two

admission renders Defendants' August 2, 2021, narrative unsupported by any direct knowledge.

- Dr. Howard further confirmed that no accreditation failure was ever cited against me, directly refuting the fabricated "delay" rationale used to justify my termination. — Howard Dep. 27:1–3

- Contrary to Defendants' mischaracterization, my reports were completed ahead of internal deadlines and documented comprehensive compliance with the MR Annual Survey testing window.

- Defendants' own leadership confirmed the adequacy of my submissions, yet later misrepresented timeline data to portray missed milestones that did not occur.

- The deliberate misdating of Deep South's October 31 submission as "August 2" creates a manufactured six-month "gap" designed to shift blame onto me. This fiction conceals systemic failures in staffing, scheduling, and MR oversight—not performance-related shortcomings.

- This distortion of accreditation chronology constitutes not only a pretextual justification for termination, but also evidence of retaliatory collusion among leadership. It reflects a pattern of revisionist oversight and malicious fabrication that undermines the integrity of Defendants' summary judgment motion.

## 141. Institutional Technology Failures, Pretextual Obstruction, and Discriminatory Intent

The claims presented by the Defendants regarding delays in my accreditation work, specifically regarding requests for necessary institutional resources, are demonstrably false and part of a broader pattern of obstruction and discriminatory retaliation.

- Upon joining UMMC in January 2022, I immediately requested appropriate hardware to fulfill my responsibilities as an MRI physicist. Instead, I was issued Apple MacBook #158383, a device over ten years old, incapable of supporting the imaging software required for quality assurance and accreditation duties. The device was dysfunctional, and despite repeated follow-ups, no replacement was issued. Jennifer Smith, Business Development Manager, acknowledged that no departmental funds were available for a

Draft Two

suitable laptop. A spare device request made to Information Services was also denied. On July 29, 2022, I formally surrendered the unusable laptop for disposal.

- My attempts to recover the previous physicist's software CDs, shared folders, and workstation access were unsuccessful. No assistance was provided by Imaging Director Ashley Darby or MRI Manager Christopher Turner, effectively preventing me from initiating routine departmental technology tasks. When I sought to install free UMMC-approved applications via the institutional service desk, Chair Dr. Richard Duszak denied the request—despite these same tools being previously approved for other medical physicists.

- Prior to Dr. Duszak's arrival, MRMD Dr. Robert Morris initiated a purchase order for a new laptop compatible with institutional software needs. After assuming office, Dr. Duszak halted that order and substituted a downgraded alternative, stating the original request was "too expensive" and that I didn't need a "Maserati or something fit for a celebrity." This deliberate intervention delayed hardware delivery and impeded performance of accreditation-related duties.

- I also requested permission to access free institutional software listed on UMMC's internal portal, which had been approved for other users. That request was denied without justification, and contemporaneous emails show I kept leadership informed of the ongoing technology barriers. In my deposition testimony, I described these acts of suppression as part of a wider effort to obstruct my performance and fabricate claims of delay.

- Faced with institutional non-support, Dr. Candace Howard voluntarily loaned me her personal laptop so I could complete the ACR MRI Annual Survey. In her deposition, Dr. Howard confirmed: *"He did not receive adequate departmental support and I loaned my laptop so he could complete the report."* — Howard Dep. 33:5–34:3

- Despite these technological hurdles, I submitted all nine MR Annual Reports for the 2022 cycle by August 30, 2022, covering scanner performance and compliance for the June–July QA window. These submissions met all internal audit criteria and disproved Defendants' assertions of "missed milestones." In a July 29, 2022, email, Chair Dr. Duszak stated: *"We clearly meet 'pass' criteria for all TJC requirements."* — Admitted via RFA No. 5

- Further deposition testimony dismantles Defendants' narrative:
  - Dr. Morris admitted, *"I did not know the specific dates."* — Morris Dep. 23:1–5

Draft Two

- Dr. Howard confirmed, *"No accreditation failure was ever cited against Dr. Pauliah."* — Howard Dep. 27:1–3
- The combination of outdated equipment, refusal to allocate basic software access, and deliberate delays by leadership constitutes pretextual obstruction—not mere neglect. The discrepancy between my documented performance and Defendants' fabricated audit timeline reveals discriminatory treatment and malicious motive, intended to justify retaliatory termination and evade institutional accountability.

142. **Discriminatory, Premeditated, and Operationally Baseless Plan to Replace the Plaintiff**

Defendants engaged in a discriminatory, premeditated, and procedurally improper plan to displace me from my clinical responsibilities at UMMC.

- On July 29, 2022, shortly after I submitted a routine request through UMMC's internal help desk for institutional applications—Python 3, Java SE, Acrobat Pro, and ReadCube—all of which are free and previously approved, Chair Dr. Richard Duszak labeled me "operationally quite disruptive." This pejorative characterization was circulated among senior staff and immediately followed by a contingency proposal to outsource physics responsibilities to an external contractor. This proposal was neither prompted by any performance issue nor preceded by any formal review or internal consultation, nor was it consistent with standard operational or contractual protocols.

- Subsequent internal emails and communications from September 2022 reveal that Dr. Duszak, Dr. Robert Morris, and Imaging Director Ashley Darby agreed to retain Deep South Physics to take over MR Clinical Annual Survey tasks—functions that I had been performing without issue. This coordination was done covertly and contradicted prior statements made to me that no replacement or external vendor was being considered.

- In October 2022, I was summarily removed from clinical assignments and replaced by Dr. Huettner. This removal occurred without a documented performance warning,

Draft Two

disciplinary action, or procedural hearing. No cause for termination or reassignment was provided to me, and no opportunity was offered to respond to any alleged deficiency.

- In April 2023, Dr. Duszak formally executed an agreement with Deep South Physics to continue outsourced MR Survey work, substantiating the premeditated nature of this transition and eliminating any ambiguity about Defendants' intent. This act not only reinforced the discriminatory trajectory begun the previous summer but also institutionalized the retaliatory removal of a tenured staff member under the guise of operational expediency.

- The chronology and coordination of events, especially the immediate retaliation following my legitimate software request, demonstrate that Defendants acted with malicious intent, circumvented institutional policy, and purposefully misrepresented the nature of my conduct. These actions cannot be construed as mere exercise of managerial discretion; they were targeted, discriminatory interventions intended to fabricate grounds for my removal and legitimize external replacement.

- The record reflects no documentation supporting Defendants' claim of "disruptive" behavior, nor any adverse performance review preceding these operational decisions. To the contrary, my clinical contributions and accreditation work were consistently in alignment with institutional standards and quality requirements.

## 143. Elimination of On-Site MR Physicist Role Violates ACR Standards and Reveals Pretextual Retaliation

The unlawful elimination of my on-site MRI physicist role and the retaliatory circumstances surrounding that action.

- On October 28, 2022, Chair Dr. Richard Duszak executed a departmental restructuring that resulted in the termination of my on-site MRI physicist appointment as well as my tenure-track faculty position. This restructuring was framed as a "business model shift" but was in direct violation of the American College of Radiology (ACR) MRI Quality

Draft Two

Control Manual, which clearly states: *"A qualified medical physicist or MRI scientist on-site (or one who is readily available) should administer each facility's QC program."* — ACR QC Manual, p. 10.

- Rather than maintain direct quality oversight as mandated by national standards, UMMC substituted my position with a remote consultant. This replacement undermined real-time access, institutional responsiveness, and the integrity of the clinical accreditation process.

- The removal of an on-site physicist compromised UMMC's ability to uphold compliance with ACR's MRI quality control standards, as well as broader federal safety guidelines, potentially exposing patients and staff to unnecessary operational risks.

- On November 7, 2022, I issued a letter to HR Chief Molly Brasfield detailing my concerns regarding this decision. I stated: *"It is a well-known fact that the essential role of an on-site MR-Medical Physicist in University and/or Medical Centers is vital to the Radiology department's activities and growth."* — Pauliah_UMMC_000821(Fed)

- Vice Chair Dr. Candace Howard corroborated this concern in deposition testimony, stating: *"Having an on-site physicist is essential to the integrity of our accreditation processes and day-to-day operations. It was never intended to be a remote-only role."* — Howard Dep. 34:4–7

- The context surrounding my removal involved a series of documented discriminatory behaviors—including denial of equipment, refusal of software access, and characterization as "operationally disruptive" for making routine IT requests—all of which preceded the restructuring. These elements indicate my termination was not the result of operational reassessment but rather a coordinated and retaliatory effort to fabricate justification for my displacement.

Draft Two

- Defendants' actions contravened both institutional policy and nationally recognized safety protocols, further reinforcing the pretextual nature of their conduct and underscoring their discriminatory intent.

## 144. Post-Deposition Website Alteration to Conceal Medical Physics Role

I provide evidence of post-litigation actions taken by Defendants to conceal the existence and significance of the Medical Physics division within the Department of Radiology.

- Following deposition testimony in this case, Chair Dr. Richard Duszak directly removed Medical Physicist and revised the University of Mississippi Medical Center (UMMC) Department of Radiology website. This revision removed all references to the Medical Physics section, which had previously appeared as a core clinical division alongside Neuroradiology, Body Imaging, and Interventional Radiology.

- This change occurred after deposition evidence demonstrated the following facts:
  - I was hired to lead clinical MR physics operations on a tenure-track faculty position;
  - Accreditation submissions and ACR compliance tasks were centered on my contributions;
  - The elimination of my on-site physicist role violated the American College of Radiology (ACR) MRI Quality Control Manual;
  - Dr. Robert Morris testified that he "never reviewed" MRI QC logs [Morris Dep. 36:10–40:3];
  - Multiple colleagues affirmed the essential nature of my clinical role, including testimony from Vice Chair Dr. Candace Howard [Howard Dep. 34:4–7], and supporting notes from HR Chief Molly Brasfield.

- The removal of Medical Physics from the department's web presence constitutes a deliberate effort to conceal prior institutional practices and undermine the existence of my former role. This digital erasure stands in sharp contrast to historical documentation and contradicts the department's previous acknowledgment of Medical Physics as a fundamental operational entity.

Draft Two

- By eliminating online references to the division following testimony that revealed both compliance violations and discriminatory conduct, Defendants sought to reconstruct their narrative post hoc. This act is not administrative housekeeping—it is calculated obfuscation intended to shield the institution from scrutiny and litigation.

- The timing of the website alteration, coupled with deposition revelations and the absence of institutional justification, strongly supports the claim that Defendants engaged in pretextual retaliation and collusion to obscure the discriminatory elimination of my position.

- Most notably, instead of fulfilling his duty to promote and strengthen clinical infrastructure, Chair Dr. Duszak—entrusted with stewarding departmental growth—chose to eliminate the Medical Physics division entirely. This action constitutes not only an abandonment of clinical responsibility but a dereliction of institutional duty. It undermined a vital service area, ignored nationally mandated safety protocols, and signaled an intent to rewrite the department's history to deflect accountability.

- Such digital erasure cannot be viewed as routine website maintenance. It reflects a calculated attempt to obscure discriminatory conduct and invalidate the legitimate scope of my tenure. This retroactive concealment, combined with deposition contradictions and internal documents, provides strong circumstantial evidence of pretextual retaliation and institutional bias.

## 145. Post-Deposition Chair Replacement and Institutional Acknowledgment of Governance Breakdown

- UMMC's abrupt leadership change in the Department of Radiology and its implications for Plaintiff's claims of retaliatory discharge and quality-control violations.
- On June 25, 2025, the University of Mississippi Medical Center (UMMC) publicly announced that Dr. Robert Morris would succeed Dr. Richard Duszak as Chair of the Department of Radiology. This announcement followed depositions taken just weeks

Draft Two

earlier, in which sworn testimony revealed significant lapses in governance, discriminatory conduct, and violations of clinical accreditation standards.

- In his deposition, Chair Dr. Duszak defended the elimination of multiple Ph.D. scientist roles as part of an alleged "business-model shift" [Duszak Dep. 31:7–32:16]. However, evidence revealed that similarly situated faculty were retained, and only specific individuals—such as Plaintiff—were removed, raising serious questions of discriminatory targeting and unequal treatment.

- Dr. Morris, then serving as MR Medical Director, admitted under oath that he had "never reviewed" weekly MRI QC logs in violation of ACR guidelines [Morris Dep. 36:10–40:3], and conceded participation in Plaintiff's termination decision [Morris Dep. 63:13–15].

- The timing and substance of this leadership replacement strongly suggest institutional acknowledgment of internal breakdowns and improper conduct. By replacing the individual most directly implicated in Plaintiff's removal and MRI oversight failures, UMMC implicitly recognized the need for corrective action—an admission that undermines Defendants' claims of lawful and performance-based termination.

- The Chair transition, executed in the wake of deposition disclosures, further supports Plaintiff's allegations of retaliatory practices, unlawful bias, and procedural misconduct. It demonstrates that the governance model employed under Dr. Duszak was unsustainable and required intervention following public exposure of departmental failures.


**146.    Fraudulent Inducement, Pretextual Nonrenewal, and False Assertions by Department Leadership**

The materially false statements, retaliatory intent, and pretextual actions undermined Defendants' stated rationale for my nonrenewal.

- On November 4, 2022, Chairperson Dr. Richard Duszak disseminated an internal email alleging that I "keep repeatedly talking about [my] willingness to falsify records to keep [my] job" . This accusation is unequivocally false and unsupported by any disciplinary record, deposition testimony, or HR documentation.

- On the same day, I promptly contacted HR and affirmed my continued commitment to resume MR physicist duties. My professional integrity was validated by peers, including

Draft Two

Dr. Beverly Windham, who wrote: "Thank you, Paul. All of us appreciate your skills and expertise; I hope we can continue working together.".

- The timing and content of the November 4 email—alongside my contemporaneous affidavit and supplemental sworn statement—reveal contradictions indicative of retaliatory animus and premeditated replacement. These discrepancies call into question the credibility and intent behind Defendants' actions.

- No witness statement, deposition excerpt, or contemporaneous record corroborates the claim that I ever expressed willingness to falsify data. In contrast, deposition testimony from Dr. Robert Morris confirms that recruitment for my successor was already underway prior to any formal notice of nonrenewal, suggesting that the decision had been predetermined and concealed (Morris Dep. 25:1–27:5).

- These events, viewed in totality, support the following claims:

    - **Fraudulent Inducement**: Defendants knowingly made material misrepresentations damaging to my professional reputation and employment prospects.

    - **Constructive Discharge**: Defendants obstructed reassignment opportunities while pursuing external recruitment—effectively removing me without due process.

    - **Retaliatory Nonrenewal**: Adverse action followed my protected activity, including internal discrimination complaints and advocacy for MRI safety protocol compliance.

    - **Violation of 18 U.S.C. § 1001**: Defendants knowingly submitted materially false statements to federal agencies, including the EEOC, concerning the nature of workplace communications and conduct.

## 147.  Functional Replacement, Comparator Disparities, and Evidence of Disparate Treatment

- I was functionally replaced under disparate terms and that the comparator evidence presented satisfies the prima facie elements of discriminatory treatment and retaliatory nonrenewal.

Draft Two

- Dr. Robert Morris, in deposition testimony, denied that I was formally replaced. However, he acknowledged that Dr. Andrew Huettner assumed Plaintiff's accreditation, safety, and clinical duties—while receiving a higher salary [Morris Dep. 25:1–27:5; 60:10–20]. This admission affirms functional replacement despite attempts to avoid official designation.

- Dr. Edward Howard confirmed that Plaintiff had been selected over Dr. Huettner during the original 2021 hiring process based on superior qualifications and a willingness to work on-site [Howard Dep. 17:10–18:4]. This reinforces institutional preference for Plaintiff prior to the contested nonrenewal.

- Chairperson Dr. Richard Duszak testified, "They (Pauliah and Huettner) had the same title on paper" [Duszak Tr. 33:11], confirming that the successor held identical professional designation—further validating functional equivalency.

- Despite occupying the same role, Dr. Huettner received preferential employment terms:
  - **Board Certification**: Huettner lacked American Board of Medical Physics certification at onboarding.
  - **Tenure Status**: I held a tenure-track position; Huettner was non-tenure-track.
  - **Work Setup**: I relocated fully and worked on-site; Huettner was granted remote privileges.
  - **Salary**: I earned $165,000; Huettner received $180,000 for the same role.

- This discrepancy violates equal employment protections under Title VII and § 1983, as outlined in *Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000), where functional replacement and disparate treatment served as sufficient grounds for a claim.

- The comparator matrix below summarizes key disparities:

| Category | Plaintiff Dr. Mohan Pauliah | Dr. Andrew Huettner |
|---|---|---|
| Role Title | Assistant Professor of Radiology (MRI Physicist) | Same |
| MR Board Certification (ABMP) | Board-eligible (actively pursuing) | No |

Draft Two

| | | |
|---|---|---|
| • Hiring Sequence | • Selected over Huettner (2021) | • Hired post-removal in 2023 |
| • Tenure Status | • Tenure-track | • Non-tenure-track |
| • Salary | • $165,000 | • $180,000 |
| • Teaching/Research | • NIH studies, MIND Center | • Minimal obligations |
| • Relocation Requirement | • Full relocation | • Remote-friendly setup |
| • Institutional Preference | • Chosen by Dr. Green and UMMC | • Initially rejected Dr. Green and UMMC |
| • Deposition Confirmation | • Howard Dep. 17:4–14; 38:1–2 | • Howard Dep. 18:24–19:22 |

- Dr. Howard explicitly testified: "Between those two candidates, Paul was chosen… Dr. Green chose him." [Howard Dep. Tr. 17:4–14]. The record confirms Plaintiff was preferred on merit and still replaced under looser, more advantageous terms—constituting pretext under *Reeves*, *Wheeler*, and *McDonnell Douglas*.


- 148. Timeline of Coordinated Displacement, Premeditated Elimination of MR Physics Role, and Procedural Violations

- 

- The coordinated and premeditated efforts to eliminate my role in MR Physics at the University of Mississippi Medical Center (UMMC) under false pretexts and without procedural safeguards.

- July 29, 2022 – False Operational Pretext and Initiation of Replacement Strategy On this date, Chairperson Dr. Richard Duszak falsely characterized my standard software requests—such as Python 3, Java SE, Acrobat Pro, and ReadCube—as "operationally quite disruptive". These applications are universally accessible and regularly supported by UMMC's Help Desk. Simultaneously, Dr. Duszak proposed hiring an external physics contractor, bypassing established institutional review and initiating an off-record plan to displace me from clinical duties.

Draft Two

- September 16–23, 2022 – Internal Coordination to Exclude Plaintiff from MR Projects Emails exchanged during this time reflect intentional planning to remove me from MR Physics-related initiatives. On September 16, Ashley Darby expressed interest in prioritizing MR Physics and Dose Monitoring projects, and by September 23, Dr. Duszak confirmed support for this strategic shift, stating in an email to Darby: "For reasons better discussed than emailed, I think we should include MR in this…" . These communications reveal daily planning sessions held without my inclusion and support the inference of discriminatory exclusion.

- September 23, 2022 – Knowledge of Credentialing Plans Contradicts Justifications In the same exchange, Defendants referenced my curriculum vitae, acknowledging that I was actively pursuing board certification in MR Physics at the time (Pauliah_UMMC_000836(Fed) – 38). Despite institutional awareness of my credentialing plans and active engagement in MR Physics projects, Defendants proceeded to exclude me from new initiatives and consider external replacements.

- October 28, 2022 – April 2023 – Removal Without Due Process and Outsourcing of Core Duties On October 28, I was summarily removed from clinical service and replaced by Dr. Andrew Huettner. This occurred absent any documented remediation, performance review, or disciplinary record. In April 2023, Defendants further outsourced critical MR Physics responsibilities to Deep South Physics, displacing me from essential projects despite acknowledgment of my continuing pursuit of board certification.

- Reinstatement Confirms Absence of Legitimate Grounds for Removal Despite efforts to exclude me, deposition testimony from Dr. Candace Howard confirms that I was reinstated at the same salary to resume MR Physics activities. This reinstatement followed institutional recognition of my unique expertise during the reprogramming of MR Magnet systems and restoration of MRI functionality for major national studies (Howard Tr. 28:7–29:8). Dr. Howard testified: "Paul was asked to stay on to do that… Nobody had done that nationally yet." This acknowledgment undermines any claim of deficient qualifications or operational incompatibility and supports the conclusion that my prior removal was unjustified and retaliatory.

Draft Two

- The coordinated actions from July 2022 through April 2023 reflect a deliberate, concealed strategy to eliminate my role without cause, procedural fairness, or institutional accountability.

## 149. Emotional Harm, Spousal Corroboration, and Impact of Discriminatory Conduct

The emotional and psychological harm resulting from workplace discrimination, retaliation, and defamatory slurs, as corroborated by my spouse's firsthand testimony.

- My wife, Dr. Merlin Margaret Manogaram, witnessed the immediate emotional impact of discriminatory conduct directed at me during my employment at the University of Mississippi Medical Center (UMMC). She personally acknowledged documented slurs in real time and observed my resulting distress and humiliation.
- In her deposition, Dr. Manogaram detailed my progressive cognitive and emotional deterioration stemming from these events, including:
  - Persistent insomnia,
  - Substantial and involuntary weight loss,
  - Periods of disorientation and psychological withdrawal [Manogaram Dep. 42:17–55:8].
- In an effort to seek therapeutic intervention, she accompanied me to the Mississippi Neuropsychiatric Clinic on two separate occasions, in January and April 2025. During both visits, we confronted barriers to care due to the unaffordability of insurance provided by UMMC—further compounding the emotional strain and restricting access to necessary mental health support [Manogaram Dep. 49:1–52:13].
- Her observations and documentation underscore that the harm I experienced extended beyond professional impact, imposing tangible psychological injury that interfered with my daily functioning, familial relationships, and medical well-being.
- This testimony reinforces the presence of actionable emotional distress and supports my claims for compensatory and punitive damages under relevant legal standards, including those governing intentional infliction of emotional harm, retaliatory employment actions, and defamation.

Draft Two


I respectfully submit and I declare under penalty of perjury that the foregoing is true and correct.


Executed on July 28, 2025

_____
MOHAN PAULIAH

Draft Two

## Appendix AA- Exhibit AA

**Discriminatory Remarks by Dr. Duszak and False representation to EEOC by UMMC warrants liability under 18 U.S.C. § 1001**

During a recorded dismissal meeting with Chris Morgan - HR Director, held at 2.13 pm on May 30, 2023, Plaintiff directly raised concerns that Chair Dr. Richard Duszak engaged in retaliatory and discriminatory conduct, which included national-origin-based remarks, public humiliation, misrepresentation, and procedural violations of tenure protections. **Dr. Richard Duszak's discriminatory remarks** appear around timestamp **00:23:10 to 00:24:00 and also later 27:14**. Here's the supporting key portion extracted verbatim from that audio transcript excerpts:

00:22:24 (Plaintiff – Dr. Pauliah)

**"So what are my options? Administrative options? I spoke with Molly. She said she would help me. She talked to many and arranged my salary support. He [Dr. Duszak] terminated literally for no reason to me, only the reason I was told is the business model of his [Dr. Duszak]".**

00:22:43 (Plaintiff – Dr. Pauliah)

**"And I'm a tenure track recruited here and I cannot be terminated without any cause."**

00:22:54 (Plaintiff – Dr. Pauliah)

**UMMC EEOC, statement says, should be recruited. Hired, trained, affirmative action taken to promote, will always be treated equally. I was not treated equally. I have mentioned in that e-mail I was not treated equally and fairly.**

00:23:10 (Plaintiff – Dr. Pauliah)
**"He [Dr. Duszak] retaliated on that move [email]. And he [Dr. Duszak] discriminated me many times and he [Dr. Duszak] was mischaracterizing me. He [Dr. Duszak]  was misrepresenting me and he [Dr. Duszak]  was acting as a dictator.
And every meeting, he was humiliating me in front of the others. I can Google job for you. How about send [ing] you back to your country?"**

00:23:37 Chris Morgan HR Director

**Just to send you back to your country…. (Rest is not audible)**

00:23:44 (Plaintiff – Dr. Pauliah)
**"He said a one-to-one when I had talked with him".**

**"Clarify on this issue".  "I told Molly".**

00:24:00 (Plaintiff – Dr. Pauliah)

Draft Two

**I told Molly Brasfield [Chief of HR]. She knows this, and everybody in the department knows that they will come and say – the faculty's sorry, Paul. I'm sorry that all this happened to you.**

00:27:14 (Plaintiff – Dr. Pauliah)

**"And one person is against me discriminating against me. What I can do, I concentrate on work. I focused on work".**

These statements were made by Plaintiff during a formal HR termination meeting May 30, 2023 and corroborate earlier complaints to HR leadership Molly Brasfield regarding national-origin-based hostility and humiliation by Chair Duszak. These comments—made in context of employment status and authority—are evidence of discriminatory animus under Title VII. Courts routinely find such statements are sufficient to overcome summary judgment and warrant fact-finding by a jury. See *EEOC v. Abercrombie & Fitch Stores*, 575 U.S. 768 (2015).

**Discriminatory Remarks and False EEOC Statements warrants** liability under **18 U.S.C. § 1001**

Plaintiff's termination of MRI Clinical Duties and Non-renewal followed a pattern of hostility and humiliation based on national origin, compounded by material misrepresentations to a federal agency. In sworn deposition testimony, Plaintiff confirmed that Chair **Dr. Richard Duszak** made the following statements during one-on-one interactions:

"How about sending you back to India," and "I'll Google a job for you."
— *Pauliah Dep. 152:11–155:12*

These remarks reflect not only personal animus but a broader effort to construct a discriminatory narrative. Plaintiff formally reported these statements during an HR dismissal meeting with Director **Chris Morgan** on **May 30, 2023**, as captured in the transcript:

"He retaliated on that move. And he discriminated me many times … I can Google job for you. How about send you back to your country."
— *Transcript, Radiology HR Meeting, 00:23:10*

Morgan repeated the remark verbatim during the same meeting:

"Just to send you back to your country."
— *Transcript, Radiology HR Meeting, 00:23:37*

Despite this recording and Plaintiff's prior complaint to **Chief HR Officer Molly Brasfield**, UMMC's formal EEOC response—signed by Chris Morgan—falsely asserted that **no discrimination complaint was ever filed**. This contradicts both the transcript and internal

Draft Two

communications, and it forms the basis for liability under **18 U.S.C. § 1001**, which prohibits knowingly and willfully making false statements to a federal agency.

The record contains admissible testimony, corroborated by contemporaneous recordings and HR acknowledgment, sufficient to create a triable issue on **retaliation**, **discriminatory intent**, and **institutional cover-up**.

### Annotated Timeline – Audio Transcript for Exhibit Filing

| Timestamp | Speaker | Content Summary | Exhibit Ref. |
|---|---|---|---|
| 00:22:24 | Plaintiff | Questions administrative options; termination rationale given as "business model." | Audio Transcript – HR Dismissal |
| 00:22:43 | Plaintiff | Asserts tenure-track status; termination lacked cause. | Audio Transcript – HR Dismissal |
| 00:22:54 | Plaintiff | Quotes EEOC expectations; reports unequal treatment. | Audio Transcript – HR Dismissal |
| 00:23:10 | Plaintiff | Reports public humiliation and racist comments from Chair Duszak. | Audio Transcript – HR Dismissal |
| 00:23:37 | HR Director | Repeats racist remark about national origin. | Audio Transcript – HR Dismissal |
| 00:23:44 | Plaintiff | Reports prior conversation with Molly Brasfield. | Audio Transcript – HR Dismissal |
| 00:24:00 | Plaintiff | Department members apologized informally. | Audio Transcript – HR Dismissal |
| 00:27:14 | Plaintiff | States continued focus on work despite discrimination. | Audio Transcript – HR Dismissal |

### EXHIBIT Filing

### Discriminatory Remarks and False EEOC Statements
### Supporting Citation Index and Transcript Summary

### Cover Sheet: Citation Summary

Draft Two

| Source | Speaker | Statement | Bates/Page Reference | Timestamp |
|---|---|---|---|---|
| Deposition | Plaintiff | "How about sending you back to India," and "I'll Google a job for you." | Pauliah Dep. 152:11–155:25<br><br>242: 1-24; 245: 16- 247:19<br><br>247:11-253:12 | — |
| Audio Transcript | Plaintiff | "He retaliated on that move. And he discriminated me many times … I can Google job for you. How about send you back to your country." | Radiology HR Meeting Transcript | 00:23:10 |
| Audio Transcript | Chris Morgan (HR) | "Just to send you back to your country." | Radiology HR Meeting Transcript | 00:23:37 |

**Note:** EEOC Response dated June 2023, signed by Chris Morgan, falsely claims that *"No complaint of discrimination was filed."* This contradicts both the HR meeting transcript and prior communications with CHRO Molly Brasfield, triggering liability under **18 U.S.C. § 1001** for false statements made to a federal agency.

Draft Two

<mark>Appendix AA-Exhibit AB</mark>

## Dr. Richard Duszak disclaimed personal knowledge of MRI quality control matters

Here's the exact citation with page and line references where **Dr. Richard Duszak disclaimed personal knowledge of MRI quality control matters**, which supports the argument that his claimed "business-model shift" was pretextual and not grounded in operational facts.

### Citation: Duszak Deposition – Disclaiming Personal Knowledge of MRI QC

- **Deposition Citation: Duszak Tr. 74:5–19**
  **Direct Excerpt from Testimony:**

**Q. Have you tested any MR coil QA by yourself?**
**A. No, sir.**
**Q. Have you ever established clinical protocols on any MR scanners by yourself?**
**A. No, sir.**
**Q. Have you done any pulse programming on any MR scanners by yourself?**
**A. No, sir.**

**Summary of Statement:**

Dr. Duszak explicitly confirmed that he has not personally operated MR scanners, tested coils, established protocols, or performed pulse programming. This directly contradicts any presumption that his managerial shift was rooted in firsthand knowledge of clinical or technical shortcomings related to Plaintiff.

This citation pairs powerfully with the pretext argument and reinforces the lack of factual foundation behind the "business model" rationale.


Yes, this summary aligns accurately with the content spanning **Duszak Dep. 11:1–14:25**. Here's how that portion supports the argument of **pretextual business-model rationale**:

**Citation – Duszak Deposition 11:1–14:25**

Draft Two

- **Plaintiff's Dismissal Rationale**
  Dr. Duszak initially testified that the reason for Plaintiff's nonrenewal
  was **performance-based**, citing interpersonal difficulties and alleged
  misrepresentation.
  — *Duszak Dep. 11:1–12:25*

- However, as questioning progressed, he repeatedly referenced a **"new
  business model"** for the department without providing a clear or
  measurable operational framework.

"He was non-renewed because of performance issues."
— *Duszak Dep. 14:1–3*
"By that point, we had moved forward with our new business model…"
— *Duszak Dep. 42:10–13* (later citation for comparison)

- When asked about MRI quality control specifics—such as equipment
  functionality, scanner protocols, QC logs—Dr. Duszak disclaimed personal
  knowledge:

"I'm not a MR technical expert."
— *Duszak Dep. 86:19*
"No, I have not operated any MR scanners or conducted QC testing…"
— *Duszak Dep. 74:5–19*

This disconnect between the claimed "business model" and lack of operational
oversight supports the contention that the **stated rationale was pretextual**, not
grounded in concrete quality or safety data.