**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**MOHAN PAULIAH,**

*Plaintiff,*

v.

**UNIVERSITY OF MISSISSIPPI
MEDICAL CENTER,** *et al.*,

*Defendants.*

CAUSE NO. 3:23-CV-3113-CWR-ASH

**ORDER**

In a prior Order, the Court granted summary judgment in favor of Defendants on all federal claims and declined to exercise jurisdiction over the remaining state-law claim. Docket No. 141. Normally, this would close the case on the Court's docket; however, the declaration filed by Plaintiff in support of his opposition to summary judgment, Docket No. 124-1, contained multiple fabrications and misrepresentations of the record. The Court determined the declaration was filed in bad faith and struck it in its entirety. Docket No. 141.

Concerned with the process that Plaintiff and his former counsel used to prepare and review Plaintiff's sworn declaration, the Court retained jurisdiction for purposes of conducting a hearing under Rule 56(h) to determine what sanctions, if any, are appropriate. Pro se Plaintiff Mohan Pauliah, his former counsel Samuel L. Begley,[1] and Defendants—through their counsel—appeared at this hearing, held on December 18, 2025. Based on the content of that hearing and the reasons discussed below, the Court rules as follows.

---

[1] After the Court's Order on summary judgment, Mr. Begley withdrew as counsel, following a hearing before Magistrate Judge Harris. *See* Docket No. 147. As that Order noted, however, Mr. Begley remained responsible for the filings prepared prior to his withdrawal, including the bad faith declaration, and he was required to participate in this 56(h) hearing. *Id.* at 4-5.

1

**Legal Standards**

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Where a party submits a declaration "in bad faith or solely for delay, the court — after notice and a reasonable time to respond — may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result." Fed. R. Civ. P. 56(h).

**Discussion**

Courts across the country have dealt with the rising misuse of generative artificial intelligence to prepare court filings.[2] Those cases have largely, if not entirely, dealt with citations to non-existent legal authority or the attribution of quotes to cases that do not contain the quoted material—produced as a result of what has come to be termed "AI

---

[2] For just a few recent examples, see, e.g., *Disability Rights Miss. v. Palmer Home for Children*, No. 1:24-CV-99-SA-DAS, 2025 U.S. Dist. LEXIS 263114, at *59 (N.D. Miss. Dec. 19, 2025) (ordering former counsel to pay "$20,883.10 in reasonable attorney's fees and costs within 30 days" for repeatedly submitting fabricated legal citations, failing to take responsibility for the same, and arguing, wrongly, that the citations were not fictitious or irrelevant); *Billups v. Louisville Mun. School Dist.*, No. 1:24-CV-74-SA-RP, 2025 WL 3691871 (N.D. Miss. Dec. 19, 2025) (disqualifying members of law firm from continuing to represent plaintiff, ordering an attorney to withdraw from all cases pending before the judge, and barring her from appearing in any other case before the judge for a period of two years, because she submitted filings in multiple cases containing misrepresentation of law); *Couvrette v. Wisnovsky*, No. 1:21-CV-00157-CL, Docket. No. 215 (D. Or. Dec. 12, 2025) (determining that the Plaintiffs and their counsel share responsibility for "briefs containing citations to fifteen non-existent cases and fabricated quotations falsely attributed to eight legitimate authorities"; striking offending filings; issuing sanctions of $15,500; and ordering Defendants to submit bill of costs and reasonable attorney's fees, so that further amounts could be added to sanctions); and *Dubinin v. Papazian*, No. 25-CV-23877-RAR, 2025 WL 3248187, at *3 (S.D. Fla. Nov. 21, 2025) (discovering multiple instances where response to motion to dismiss cited non-existent cases and quotes; striking the Complaint; and ordering Plaintiff's counsel to pay "Defendant's attorney's fees in the amount agreed upon by the parties at the Hearing—$4,030.90 for an estimated 26.5 hours spent on the case at a rate of $152.11 per hour") (emphasis omitted).

hallucinations."[3] This case is different, as it appears that AI was used not to hallucinate the law, but to hallucinate the *facts*.

The declaration at issue contained multiple fabricated quotations, presented to the Court along with manufactured citations to deposition transcripts, as if they came from sworn testimony. The declaration also grossly mischaracterized testimony and other facts in the record. *See* Docket No. 141 at 4-6 (listing four outright fabricated quotations and other misrepresentations made to the Court). This declaration was filed in opposition to a motion for summary judgment. Counsel expressly used some of these fabricated "facts" to argue to the Court that this case contained genuine issues in factual dispute.[4] Manufacturing "facts," then presenting them to the Court as genuine, threatens to corrupt the Court's analysis and undermine the integrity of the judicial process at the summary judgment stage.

The crux of the Court's ruling on a motion for summary judgment is determining the existence or non-existence of genuine issues of material fact. To make this determination, the Court relies on submissions from the parties. *See, e.g.*, *Hawthorne v. Truck Trailer & Equipment, Inc.*, No. 3:11-CV-518-CWR-FKB, 2013 WL 1664493, at * 2 (S.D. Miss. Apr. 17, 2013) ("In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant,

---

[3] The term "hallucination" softens the reality of what generative AI is producing and what parties are presenting to courts—lies. *See* Kamran Abbasi, *Goodbye to the year of the Big Lie; hello, reverse centaur*, THE BMJ (Dec. 18, 2025), www.bmj.com/content/bmj/391/bmj.r2643.full.pdf ("Here, the term 'hallucination' deserves greater scrutiny. An AI hallucination is a fabrication, a lie, [] bullshit.").

[4] *See, e.g.*, Docket No. 125 at 17 (relying on the fabricated quote that "No accreditation failure was ever cited against Dr. Pauliah" and falsely attributing it to "Howard Dep. 27:1-3"); *id.* at 18 ("Recognizing the institutional failure, Dr. Candace Howard offered her personal laptop to Plaintiff for completing the ACR MRI Annual Survey. She confirmed in deposition: 'He did not receive adequate departmental support and I loaned my laptop so he could complete the report.' — Howard Dep. 33:5–34:3"). Each of these quotations were presented as germane to material issues requiring, as Plaintiff then urged, denial of summary judgment. Neither of these quotations appear anywhere within Dr. Howard's deposition transcript.

but only when . . . both parties have submitted evidence of contradictory facts. When such contradictory facts exist, the court neither may make credibility determinations, weigh the evidence, nor can it draw from the facts legitimate inferences for the movant.") (quotation marks and citations omitted). A party's submission of fabricated "facts," hinders the issuance of court rulings.

The lies and mischaracterizations submitted in this case substantially slowed the judicial process, as it required opposing counsel, then the Court, to dedicate significant resources to first determine whether the "factual material" before the Court was even true, prior to considering any legal implications that may flow from these "facts." It also precipitated what would have otherwise been unnecessary filings: Defendants' motion to strike; Plaintiff's response; Defendants' reply in support of the same. It also altered Defendants' reply in support of summary judgment.

This Court's concern is not merely for the misuse of generative AI and the inexcusable submission of fabricated "facts," slowing this process and wasting resources; the Court is also deeply concerned by the refusal of either Plaintiff or his former counsel to accept responsibility for creating and submitting these fabrications. They have had multiple opportunities to do so.

Plaintiff and his former counsel were first confronted with these falsehoods in Defendants' motion to strike, which identified many of the fabrications and misstatements contained in the declaration. Docket No. 129. When confronted with these fabricated quotations, however, they failed to take any responsibility. *See, e.g.*, Docket No. 131 at 8 (explaining the false quotation, cited as Howard Dep. 33:5–34:3, by stating "Dr. Howard's testimony discusses the Plaintiff not receiving a laptop" and entirely avoiding the portion of

4

the false quotation purporting that Plaintiff "did not receive adequate departmental support"); *id.* (claiming, that "Plaintiff's affidavit comports with Dr. Howard's page 26 deposition testimony" despite the fabricated quotation — "No accreditation failure was ever cited against Dr. Pauliah" — appearing nowhere in Dr. Howard's testimony).

After this Court found that the declaration was filed in bad faith, the Court ordered Defendants to serve on Plaintiff submissions Defendants previously provided to the Court for *in camera* review, showing the hourly rates and hours spent by counsel and staff who performed work on behalf of Defendants in response to the filing of Plaintiff's declaration. Text-Order dated Nov. 4, 2025. The Court then provided Plaintiff and his former counsel three weeks after receipt to review those submissions and file objections to the same. *Id.* Defendants' submissions totaled $15,306.00 for 66 hours of work performed by counsel, each at the rate of $225 per hour, and 4.8 hours of work performed by one paralegal at the rate of $95 per hour. In his response, Mr. Begley did not object to $2,140.50 of the work done but objected to all other time entries, "because they do not pertain to the subject of the Court's bad faith determination and decision to strike the affidavit."[5] In his response, Dr. Pauliah doubled down and rejected all responsibility, asking the Court to instead sanction his former counsel. Docket No. 162 at 4 (refusing to definitively acknowledge the existence of the defects the Court already found in the declaration, claiming that "any defect in the declaration is attributable solely to former counsel Samuel Begley" and asking the Court to impose sanctions solely upon Mr. Begley). Neither objected to the hourly rates identified by Defendants.

---

[5] As Mr. Begley was allowed to withdraw as counsel prior to providing his response, he provided his objections by email dated December 5, 2025, to the Court, copying Dr. Pauliah and counsel for Defendants.

5

Following this exchange, Plaintiff and his counsel were again afforded an opportunity to take responsibility for filing falsehoods with the Court. During the 56(h) hearing, Dr. Pauliah and his former counsel, Mr. Begley, disagreed over who drafted which portions of the bad faith declaration. Largely, they blamed each other. Mr. Begley claimed he drafted about half and Dr. Pauliah drafted about half. By contrast, Dr. Pauliah claimed he drafted merely two to three paragraphs in the more than 40-page, single-spaced declaration. Dr. Pauliah's assertion is preposterous.[6] Regardless, neither is blameless. Mr. Begley acknowledged at the hearing that he had a responsibility to review whatever Dr. Pauliah prepared, and Dr. Pauliah admitted, after some questioning, that he used generative AI to draft at least a portion of his declaration. He also admitted he did not review his declaration prior to signing it.

Mr. Begley's actions are unacceptable. The Court understands that Mr. Begley and other lawyers may be unfamiliar with artificial intelligence, the hallucinations it has shown itself prone to, or how their clients may use or misuse it. That said, lawyers are obligated to maintain the standards imposed on them as officers of the court, including forthrightness and candor. Those obligations predate artificial intelligence by centuries. How Mr. Begley did not recognize or uncover Dr. Pauliah's citations as completely fabricated deposition testimony is hard to fathom, as Mr. Begley not only attended the depositions, he took them,

---

[6] Dr. Pauliah has filed emails in the record which appear to show him taking an active role in the response to Defendants' motion to strike. *See* Docket No. 162-14 at 21 (email from Dr. Pauliah to Mr. Begley dated August 25, 2025—the day before Plaintiff's response to the motion to strike was filed—appearing to encourage Mr. Begley to avoid taking any responsibility for the fabrications, stating "There is one additional correction needed on page 9, lines 1 and 2. Kindly remove the text highlighted in green: '***Rather, it appears to be entirely fabricated.***' The corrected sentence should read: **Response**: Dr. Howard's deposition testimony comports with paragraphs 139 and 147.") (emphasis in original). In addition, at the end of the hearing, Dr. Pauliah admitted to using AI—offering as his only excuse, that everyone does.

and he obtained copies of the transcripts. Simply turning to the purported source of any of these quotations—each was accompanied by a manufactured citation to a deposition transcript, ostensibly to lend the appearance of authenticity—would have revealed them as fake. Further, once Defendants filed their motion to strike, Mr. Begley should have discovered the fabrications and, upon his discovery, been honest with the Court. Mr. Begley did not meet the demands of his professional obligations here.

Dr. Pauliah's behavior is also unacceptable. He admitted to signing a declaration, under the penalty of perjury, without verifying—or even attempting to verify, it seems—the truth of its contents. He has yet to accept responsibility for the role he played in submitting these fabrications to the Court and then denying that they were fabrications, once confronted. Mr. Begley's obligation to review his client's declaration does not absolve Dr. Pauliah. Whether he recognizes it or not, Dr. Pauliah may not draft his own declaration with disregard for the veracity of its contents. Just above his signature, he declared: "under penalty of perjury that the foregoing is true and correct." Docket No. 124-1 at 37. It was not.

The Court finds that sanctions are appropriate in this case. Neither Mr. Begley nor Dr. Pauliah objected to the Defendants' rates for counsel or staff. Using those rates, the Court finds that 40.4 hours of work, totaling $8,570, are directly related to identifying and responding to the fabrications contained in the offending declaration. This amount includes the 10.9 hours, totaling $2,140.50, to which Mr. Begley did not object. Upon taking into consideration Plaintiff's and his former counsel's economic circumstances,[7] *see, e.g.*, *Coats v.*

---

[7] At the 56(h) hearing, Mr. Begley represented that he is no longer in private practice. In his response and objections to Defendants' fee submission, Mr. Begley further represented that he "is a salaried employee of Jackson city government, which is his chief source of income, and [he] does not have professional

*Pierre*, 890 F.2d 728 (5th Cir. 1989) (considering pro se plaintiff's economic circumstances to justify reduction in sanctions amount); however, the Court finds that $5,000 is an appropriate amount to levy against Mr. Begley and Dr. Pauliah. The Court apportions responsibility for this amount as follows.

The Court **ORDERS** Mr. Begley to pay four thousand dollars ($4,000) to FORMAN WATKINS & KRUTZ, LLP within 120 days of this Order.

The Court **FURTHER ORDERS** Mr. Begley to attend a continuing legal education course, for a minimum of three (3) hours of Mississippi CLE credit, on the topic of hallucinatory citations generated by AI in the legal field and submit proof of attendance to the Court within 120 days of the date of this Order.

The Court **FURTHER ORDERS** Dr. Pauliah to pay one thousand dollars ($1,000) to FORMAN WATKINS & KRUTZ, LLP within 120 days of this Order.

There remain a few unresolved motions on the Court's docket. Plaintiff's motion to supplement the record, Docket No. 154, is denied as moot. Dr. Pauliah has filed the same material under a separate notice to supplement. Docket No. 155.

Plaintiff's motion to compel an affidavit from his former counsel, Docket No 157, is denied. The Court's 56(h) hearing and this Order have sufficiently addressed these issues.

Plaintiff's motion to hold his former counsel in contempt, Docket No. 158, is denied. The Court's 56(h) hearing and this Order have sufficiently addressed these issues. Specifically, Mr. Begley stated during the 56(h) hearing that he has turned over to Dr. Pauliah

---

malpractice insurance to cover this matter." He also represented that Dr. Pauliah "has not been employed since he left UMMC, as evidenced by his tax returns that he provided the defense in discovery."

whatever client file and/or information Dr. Pauliah may need to continue his pursuit of this case.

Plaintiff's motion for leave to exceed page limits, Docket No. 161, is denied as moot. The Court's 56(h) hearing and this Order have sufficiently addressed the issues that he sought to expand through additional pages.

Plaintiff's motion for judicial review, Docket No. 165, and his motion for leave to file a sur-reply, Docket No. 166, are also denied. The Court's 56(h) hearing and this Order have sufficiently addressed these issues.

With these matters now addressed, the Court finds that this case should be closed on its docket. A separate final judgment shall issue.

**SO ORDERED**, this the 30th day of December 2025.

s/ Carlton W. Reeves  
UNITED STATES DISTRICT JUDGE